# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00151-CV

**Texas Board of Chiropractic Examiners; and Yvette Yarbrough, Successor to Glenn Parker, Executive Director, Appellants**

**v.**

**Texas Medical Association, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-11-000326, HONORABLE RHONDA HURLEY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

The Texas Medical Association ("TMA") sued the Texas Board of Chiropractic Examiners ("the Board") and its executive director seeking a declaration that portions of the Board's administrative rule defining the scope of chiropractic practice were invalid. *See* 22 Tex. Admin. Code § 75.17 (2011) (Tex. Bd. of Chiropractic Exam'rs, Scope of Practice). The rule provisions at issue purport to authorize certain of the Board's licensees to perform "Technological Instrumented Vestibular-Ocular-Nystagmus Testing." *See id.* §§ 75.17(c)(2)(F), (c)(3)(C). On cross-motions for summary judgment, the district court rendered judgment invalidating those portions of the Board's administrative rule. On appeal the Board contends that, as a matter of law, the rule is valid or, in the alternative, the existence of fact issues precluded summary judgment. We will reverse the summary judgment and remand the cause to the trial court.

**BACKGROUND**

The practice of medicine in Texas is regulated by the Texas Medical Board, and the legislature has mandated that a person cannot lawfully "practice medicine" in the state without a Texas Medical Board-issued license. *See* Tex. Occ. Code Ann. §§ 151.001-.056 (West 2012) (Medical Practice Act). The Medical Practice Act defines "practicing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions" by a person who either "directly or indirectly charges money or other compensation for those services" or publicly professes to be a physician or surgeon. *See id.* § 151.002(a)(13). Carved out of the definition of "practicing medicine" are a variety of other health-related fields, practitioners of which are subject to their own regulations but are exempted from the Medical Practice Act's education, training, and licensing standards and from the Texas Medical Board's regulatory authority. *See id.* § 151.052. Among the exempted fields is "a licensed chiropractor engaged strictly in the practice of chiropractic as defined by law." *See id.* § 151.052(a)(3). Texas Occupations Code chapter 201 regulates the practice of chiropractic. *See id.* §§ 201.001-.606 (West 2012). This chapter defines the permissible scope of chiropractic practice, imposes educational and licensing requirements on chiropractors, and delegates regulatory authority over the chiropractic field to the Board.

Occupations code section 201.002(b) provides:

A person practices chiropractic under this chapter if the person:

(1) uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body;

2

(2) performs nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system;

(3) represents to the public that the person is a chiropractor; or

(4) uses the term "chiropractor," "chiropractic," "doctor of chiropractic," "D.C.," or any derivative of those terms or initials in connection with the person's name.

*Id.* § 201.002(b). In 2005 the Texas Legislature mandated that the Board "adopt rules clarifying what activities are included within the scope of the practice of chiropractic and what activities are outside of that scope," including "clearly specify[ing] the procedures that chiropractors may perform" and "any equipment and the use of that equipment that is prohibited." *See* Act of May 27, 2005, 79th Leg., R.S., ch. 1020, § 8, 2005 Tex. Gen. Laws 3464, 3466 (codified at Tex. Occ. Code Ann. §§ 201.1525-.1526).[1] In response, the Board promulgated a "Scope of Practice" rule that, among other things, authorizes certain chiropractors to perform "Technological Instrumented Vestibular-Ocular-Nystagmus Testing" (VONT). *See* 22 Tex. Admin. Code § 75.17 (c)(2)(F), (c)(3)(C).[2]

In January 2011 the TMA sued the Board seeking a declaration that the rule permitting VONT is invalid because it expands the scope of chiropractic practice beyond its

---

[1] For a comprehensive account of the history of legislation related to the regulation of chiropractors in Texas, see this Court's opinion in *Texas Board of Chiropractic Examiners v. Texas Medical Association*, 375 S.W.3d 464 (Tex. App.—Austin 2012, pet. filed).

[2] Section 75.17(c)(2)(F) provides: "To evaluate and examine individual patients or patient populations, licensees of the board are authorized to use other forms of testing and measurement." 22 Tex. Admin. Code § 75.17(c)(2)(F) (2011) (Tex. Bd. of Chiropractic Exam'rs, Scope of Practice). Section 75.17(c)(3)(C) provides that one of those other forms of testing and measurement is "Technological Instrumented Vestibular-Ocular-Nystagmus Testing." *Id.* § 75.17(c)(3)(C).

statutory limits. *See, e.g.*, *Texas Orthopaedic Ass'n v. Texas State Bd. of Podiatric Med. Exam'rs*, 254 S.W.3d 714, 722 (Tex. App.—Austin 2008, pet. denied) (rule that expanded practice of podiatry beyond statutory scope was invalid); *Office of Pub. Util. Counsel v. Public Util. Comm'n*, 131 S.W.3d 314, 321 (Tex. App.—Austin 2004, pet. denied) (agency's rules must comport with agency's authorizing statute). The TMA also asserted that the rule was invalid because it unlawfully authorizes chiropractors to practice medicine in violation of the Medical Practice Act. Thereafter, the TMA moved for summary judgment on these grounds. The Board filed its own summary-judgment motion joining issue with the TMA's validity challenge. The district court granted the TMA's motion for summary judgment, denied the Board's motion, and declared that rule 75.17(c)(3)(C) was invalid and void in its entirety and that rule 75.17(c)(2)(F) was invalid and void to the extent it purported to permit VONT. This appeal followed.

## DISCUSSION

In two issues the Board challenges the trial court's order invalidating the rules permitting chiropractors to perform VONT. The Board asserts that (1) the trial court erred in denying its motion for summary judgment and granting the TMA's motion and, in the alternative, (2) fact issues exist that preclude the court from granting the TMA's summary-judgment motion. We review the district court's summary judgment rulings de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when the summary-judgment evidence shows that there are no disputed issues of material fact and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). When reviewing a summary judgment, we

4

take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Providence Life & Accident Ins. Co.*, 128 S.W.3d at 215. When parties file cross-motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we review the summary-judgment evidence supporting both motions, determine all questions presented and preserved, and "render the judgment that the trial court should have rendered." *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

In the present case, the parties' respective entitlement to summary judgment turns principally on whether the Board had the statutory authority to adopt a rule permitting chiropractors to perform VONT. If it did not, the rule is invalid. To establish a rule's facial invalidity, the challenger must show that the rule (1) contravenes specific statutory language; (2) is counter to the statute's general objectives; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *See Office of Pub. Util. Counsel*, 131 S.W.3d at 321. In its summary-judgment motion, the TMA asserted that the challenged rule was invalid because it contravenes specific statutory language, specifically the definition of chiropractic practice contained in occupations code section 201.002(b). According to the TMA, rule 75.17(c)(3)(C) impermissibly expands chiropractic practice beyond the scope of section 201.002(b) and into the practice of medicine.

To be entitled to summary judgment, the TMA was required to conclusively establish that VONT falls outside the statutory definition of the practice of chiropractic contained in occupations code section 201.002(b). This is ultimately a mixed question of law and fact, turning

5

on the application of the occupations code to the factual record. *See Mega Child Care, Inc. v. Texas Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 309 (Tex. App.—Houston [14th Dist.] 2000) ("An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard."), *aff'd*, 145 S.W.3d 170 (Tex. 2004). If material fact issues exist with regard to whether VONT is or is not within the scope of chiropractic, summary judgment is not proper.

Statutory construction presents a question of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008). Our primary objective in construing statutes is to give effect to the legislature's intent. *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). The plain meaning of the text is the best expression of legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or unless the plain meaning would lead to absurd or nonsensical results that the legislature could not have intended. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). We look to the entire act in determining the legislature's intent with respect to a specific provision. *Upjohn Co. v. Rylander*, 38 S.W.3d 600, 607 (Tex. App.—Austin 2000, pet. denied). When a statute is ambiguous, we are required to give "serious consideration" to the construction of the statute by the administrative agency charged with its enforcement, *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011), and uphold the agency's interpretation if it is reasonable, *First Am. Title Ins. Co.*, 258 S.W.3d at 632 (citing *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823

6

(Tex. 1993)). We do not defer to an agency interpretation when a statute is unambiguous. *See Texas Citizens*, 336 S.W.3d at 624 & n.6. We also "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise, or [which] deal with a nontechnical question of law." *Rylander v. Fisher Controls Int'l Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.) (quoting 2B Singer, *Sutherland Statutory Construction* § 40.04, at 23-24 (6th ed. 2000)). Bearing in mind this standard of review, we consider whether the TMA conclusively established that VONT falls outside the practice of chiropractic as defined in section 201.002(b), specifically whether it does not, as a matter of law, constitute the use of "objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body." *See* Tex. Occ. Code Ann. § 201.002(b)(1).

### *What is VONT?*

The rule at issue purports to permit chiropractors to perform "Technological Instrumented Vestibular-Ocular Nystagmus Testing." That procedure, however, is nowhere defined in the rules. In its petition, the TMA alleged that "Vestibular-Ocular-Nystagmus Testing is used solely to diagnose a problem of the brain or inner ear." In its motion for summary judgment, the TMA stated that "[i]t generally is conceded that the phrase 'technological instrumented vestibular-ocular-nystagmus testing' is one created by [the Board] and is not otherwise used in either the chiropractic or medical professions," but argued that VONT is a "test whose purpose is to diagnose a problem of the brain, inner ears or eyes." The Board, however, asserted in its answer and motion for summary judgment that "VONT is a group of clinical laboratory tests that are used to evaluate posture and/or joint positional controls relating to involuntary eye movements," and that

7

it can be used to "analyze and evaluate balance disorders associated with the biomechanics of the musculoskeletal system." The TMA asserts that VONT "generally is of two types: Electronystagmography (ENG) and Videonystagmography (VNG)." It claims that both of these tests are "a group of eye-movement tests that look for signs of vestibular dysfunction or neurological problems by measuring nystagmus." The Board, however, maintains that VONT "*can include* ENG, VNG, balance testing, and caloric testing." (Emphasis added.) According to the Board, these are "clinical tests that are used to evaluate balance, posture, and/or joint positional controls through evaluation of involuntary eye movements." While the parties discuss various procedures they believe to be included in the definition of VONT and state their positions regarding what those procedures are designed to reveal, there is no consensus.

The TMA submitted summary-judgment evidence to support its position that VONT is a test "whose purpose is to diagnose a problem of the brain, inner ears or eyes." But the TMA's summary-judgment evidence also included the affidavit of chiropractor Frederick C. Carrick, D.C., who averred that an ocular motor test "can reveal either the presence of disease or the presence of a muscular condition [or] a skeletal condition." According to Carrick, information gleaned from VONT testing would inform the manner in which a chiropractor chose to treat musculoskeletal problems such as "a low back problem" or a knee or hip problem. He stated that such information is "utilized in rehabilitation effects with musculoskeletal disorders." In its response, the Board submitted evidence that VONT is used to reveal things about the spine and the motor aspects of the eyes.

The principal impediment to summary judgment in this case is the existence of several issues of material fact regarding the meaning and scope of the term VONT: what procedures are covered by the term, what are the purposes for performing those procedures, and what do those procedures reveal about the patient, specifically about the biomechanical condition of the spine or musculoskeletal system? While the Board cites to its own "findings" contained in the Texas Register that VONT is within the scope of chiropractic practice because it "can be used as part of chiropractic treatment to analyze and evaluate balance disorders associated with the biomechanics of the musculoskeletal system," this is no more than a premise masquerading as a conclusion. The existence of disputes about what the term VONT refers to and what it reveals about a patient are fatal to summary disposition of this mixed question of law and fact—i.e., whether, as a matter of law, VONT is or is not within the scope of chiropractic as defined by statute.

The TMA and the Board have nonetheless advanced in the trial court and on appeal several arguments to support their conflicting positions on whether VONT—whatever it entails—is within the scope of chiropractic as that term is defined in occupations code section 201.002(b).

The TMA first contends that because VONT is performed on the eyes and inner ears of a patient, neither of which is part of the spine or musculoskeletal system, the rule "ignores the statutory limitation on what a chiropractor can do by extending a chiropractor's scope of practice to the inner ears, eyes and brain." The TMA argues that because Texas law limits the practice of chiropractic to the spine and the musculoskeletal system, there is no language in the Chiropractic Act that authorizes a chiropractor to "analyze, examine or evaluate" the brain, eyes or inner ears. The TMA maintains that chiropractors are not permitted to analyze, examine, or evaluate the eyes or

9

inner ear and therefore may not perform VONT. We do not agree that the statute so limits the scope of chiropractic. Rather, the statute permits chiropractors to use objective or subjective means to analyze and evaluate the *biomechanical condition* of the spine and musculoskeletal system. *See* Occ. Code § 201.002(b)(1). This means that so long as the objective or subjective means used are capable of revealing a significant fact *about* the biomechanical condition of the musculoskeletal system or spine, the test itself need not necessarily be a direct examination *of* the musculoskeletal system or spine. This interpretation is supported by section 201.002(a)(3) of the Chiropractic Act, which expressly excludes from prohibited incisive or surgical procedures "the use of a needle for the purpose of drawing blood for diagnostic testing." *See id.* § 201.002(a)(3). This provision permitting chiropractors to draw and test a patient's blood reveals that the legislature did not intend to narrowly restrict the purview of a chiropractic examination solely to the musculoskeletal system and spine themselves. We hold that the statute does not prohibit a chiropractor from examining parts of the body other than the spine and musculoskeletal system if such an examination will assist in analyzing or evaluating the biomechanical condition of the spine or musculoskeletal system.

The second ground on which the TMA moved for summary judgment was that VONT is used to make a "differential diagnosis" of a patient's medical condition. The TMA argues that there is no statutory authority for chiropractors to diagnose diseases, an activity that constitutes the practice of medicine. *See id.* § 151.002(a)(13) ("practicing medicine" means the diagnosis, treatment, or offer to treat mental or physical disease or disorder). Whether chiropractors may engage in differential diagnosis generally has previously been the subject of dispute in a case before this Court. In *Texas Board of Chiropractic Examiners v. Texas Medical Association*,

10

375 S.W.3d 464 (Tex. App.—Austin 2012, pet. filed), the TMA argued that rendering a diagnosis was reserved to the practice of medicine and certain other health-care professions and that, by contrast, chiropractors were statutorily confined to analyzing, examining, or evaluating conditions. *Compare* Occ. Code § 201.002(b)(1) (providing that one practices chiropractic if he or she "uses objective or subjective means to analyze, examine or evaluate . . .") *with id.* § 151.002(a)(13) ("'Practicing medicine' means the diagnosis, treatment, or offer to treat . . . ."). This Court did not, however, decide the question of whether section 201.002(b)(1) can fairly be read to permit chiropractors to engage in differential diagnosis because we concluded that the argument was not raised in that appeal and we therefore lacked jurisdiction to consider it. *Texas Bd. of Chiropractic Examiners*, 375 S.W.3d at 492.[3] We need not consider the issue in the present case either, because regardless of whether chiropractors are prohibited from engaging in differential diagnosis, the TMA failed to conclusively establish that VONT is used solely for diagnosing diseases and cannot also be used to "analyze, examine, or evaluate the biomechanical condition of the spine and the musculoskeletal system." *See* Occ. Code § 201.002(b)(1). As stated above, the summary-judgment evidence was conflicting on this very issue. Thus, neither of the two arguments advanced by the TMA conclusively establishes that the rule at issue is void merely because it permits chiropractors to perform VONT. We sustain the Board's second appellate issue.

We next consider whether, as the Board contends, the trial court should have rendered summary judgment that the rule is valid. The Board asserted that VONT is within the scope of the

---

[3] The opinion states "[w]e emphasize that we express no opinions [sic] regarding the merits" of the argument.

practice of chiropractic because it meets the two-prong test the Board proposed in its motion for summary judgment. According to the Board, we should hold that VONT is within the scope of chiropractic practice because (1) it can reveal a diagnosis of conditions that may be treated within the scope of chiropractic, and (2) it does not involve any procedure that a chiropractor is specifically prohibited by law from performing. The Board contends that VONT is within the scope of chiropractic because it is a test that reveals conditions that may be treated by chiropractic. One example relied on by the Board for that proposition is that of a patient for whom some form of VONT is used to determine that he suffers from benign paroxysmal positional vertigo (BPPV). The Board submitted deposition testimony of chiropractor J. Brandon Brock, D.C., who stated that of twenty patients on whom he has most recently performed VONT, fifteen "had benign paroxysmal conditions that [he] personally treated and fixed within five or ten minutes." The Board argues that it is illogical to construe a statue to prevent a chiropractor from performing a test that would tell him that the patient was an appropriate candidate for chiropractic treatment. The fallacy in this argument is that it is evident from the TMA's summary-judgment evidence that the procedure that corrects BPPV, the "Epley maneuver," is not necessarily within the scope of the "practice of chiropractic." The TMA submitted the following deposition testimony of James Kemper, M.D., explaining what BPPV is and describing the Epley maneuver, a procedure frequently used to correct it:

> Benign paroxysmal positional vertigo, or what's often called BPPV, is a specific disorder where some tiny little calcium carbonate crystals in our balance canals, called otoliths, break loose. . . . And these little particles are originally designed for static positions of the head. In other words, where I'm not moving my head, but I tilt my head upward and it's remaining in that position, those little rocks are on the end of nerve endings and they respond to gravity and send a signal to my brain from [sic] my muscles and my eyes to respond in a proper fashion. If those [otoliths] break

12

loose, they just fall, again, dependent on gravity. The most common place for that to happen is the horizontal semicircular canal. And when they fall in there, as long as the head is in a neutral position, or even if it moves in this fashion (indicating), there's not a problem. But as soon as the patient lies down, there's a very distinct rotary nystagmus. The eyes move and the patient experiences about 20 to 30 seconds of pretty intense vertigo, and it stops as long as they stay in that position. But as soon as they arise or they roll, their eyes spin around the other way and they feel it again.

The treatment for [BPPV] . . . is you take the patient through a series of movements that sort of act like one of those little—those little marble things where you have to move the marbles through a canal. You lie the patient down in a series of positions where the head is down, and the otoliths roll down to the dependent portion, and then you bring them back this way, and then you bring them all the way over this way. They're on a table the entire time. And then they tuck their chin and you sit them up, and what happens is they [the otoliths] roll out of the canal where they're causing a problem into a different part of the balance organ called the utricle. In that area they no longer cause a problem, and the patient's vertigo . . . is essentially cured.

The treatment described does not necessarily fit within the strict statutory description of the practice of chiropractic. *See* Occ. Code § 201.002. It is not clear that the treatment, as described by Kemper, is one that "improve[s] the subluxation complex[4] or the biomechanics of the musculoskeletal system." *Id.* § 201.002(b)(2) (including within scope of chiropractic "perform[ing] nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system"). Rather, the Epley maneuver involves placing the patient's head in a sequence of specific positions that cause loose otoliths that have collected in one area of the inner ear canal to roll into a different area of the inner ear canal. While a chiropractor

---

[4] The Board has defined "subluxation complex" as a "neuromusculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or neuro-physiological reflections of these articular structures, their proximal structures, and/or body systems that may be directly or indirectly affected by them." 22 Tex. Admin. Code § 75.17(b)(7).

may perform the Epley maneuver, arguably a physical therapist or physician or any other adequately trained person would be permitted to as well. In other words, the maneuver does not appear to be uniquely chiropractic. Thus, the evidence does not conclusively demonstrate that the maneuver "improve[s] the subluxation complex or the biomechanics of the musculoskeletal system."[5] The same is true of the other referenced "chiropractic treatments" that may be used to treat other balance disorders the Board claims can be identified using VONT. The Board refers to "muscle retraining" and "gait training." The record does not conclusively establish that either of these therapies improves the subluxation complex or the biomechanics of the spine or musculoskeletal system. Thus, the Board did not conclusively establish that VONT may be used to identify conditions that are treated by procedures within the scope of the practice of chiropractic. Therefore, even were we to accept the Board's proposed test, summary judgment on that ground would not be warranted.

Finally, the Board asserts that deference should be given to its conclusion that VONT is within the scope of chiropractic. While we ordinarily give "serious consideration" to the construction of a statute by the administrative agency charged with its enforcement, in this case we are mindful of the overlap and interplay between the chiropractic and medical disciplines and their respective regulatory schemes, which this Court has previously noted. In *Texas Board of Chiropractic Examiners v. Texas Medical Association*, we observed:

---

[5] The Board asserts that the TMA has, in response to requests for admissions, admitted that the Epley maneuver is within the scope of chiropractic. Whether it is or is not is a legal conclusion. Parties may not be compelled to answer legal conclusions, *Credit Car Ctr., Inc. v. Chambers*, 969 S.W.2d 459, 464 (Tex. App.—El Paso 1998, no pet.), and such conclusions do not bind the court. *Fort Bend Cent. Appraisal Dist. v. Hines Wholesale Nurseries*, 844 S.W.2d 857, 858-59 (Tex. App.—Texarkana 1992, writ denied). An admission of a purely legal issue is of no effect. *Id.*

The net effect of the statutory interplay [between the Medical Practice Act and the Chiropractic Act] is that a person licensed by [the Texas Board of Chiropractic Examiners] as a chiropractor but not by the Texas Medical Board to "practice medicine" (i.e., as a physician) can lawfully do things that would otherwise constitute "practicing medicine" as long as he remains within the statutory scope of chiropractic under chapter 201. However, to the extent he exceeds the statutory scope of chiropractic, he would subject himself to the Medical Practice Act—and practice medicine unlawfully. Another consequence of this statutory interplay is a long history of professional, scientific, or economic antagonism between chiropractors and the medical community, and resultant disputes, spanning all three branches of government, regarding where any legal line between chiropractic and the practice of medicine is or should be.

375 S.W.3d at 467. Under the circumstances, we believe it would be inappropriate and contrary to the legislature's intent to give deference to the Board's interpretation of the statutes governing the two disciplines. *See Rogers v. Texas Bd. of Architectural Exam'rs*, No. 03-10-00182-CV, 2011 WL 3371543, at *5 (Tex. App.—Austin Aug. 3, 2011, no pet.) (mem. op.) ("As neither statute establishes a clear line of demarcation between the professions, we believe it would be unreasonable and contrary to the legislature's intent to give total deference to either agency's interpretation of the statutes to the extent of any overlap.").

## CONCLUSION

For the reasons set forth above, we conclude that neither the TMA nor the Board has shown its entitlement to summary judgment regarding the validity of the rule provisions purporting to authorize certain of the Board's licensees to perform "Technological Instrumented

15

Vestibular-Ocular-Nystagmus Testing." *See* 22 Tex. Admin. Code §§ 75.17(c)(2)(F), (c)(3)(C). We therefore reverse the trial court's judgment and remand the cause to that court for further proceedings.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Reversed and Remanded

Filed:   November 21, 2012